David Puryear, Justice
The State of Texas filed suit against Bernard Morello and White Lion Holdings, L.L.C., alleging various violations of rules promulgated by the Texas Commission on Environmental Quality (the "Commission") and seeking injunctive relief as well as the imposition of civil penalties against Morello and White Lion and attorney's fees. After filing its petition, the State filed a traditional motion for summary judgment against White Lion. See Tex.R. Civ. P. 166a(c). In addition, the State requested that the district court sever the claims against Morello from those against White Lion in the event that the district court granted the State's motion for summary judgment. See id. R. 41 (allowing for severance of claims). Ultimately, the district court granted the State's motion for summary judgment and motion to sever. Subsequently, the State filed a traditional motion for summary judgment against Morello. After reviewing the State's motion and Morello's response and after convening a hearing, the district court granted the State's motion for summary judgment and ordered Morello to pay $367,250.00 in civil penalties. Following that ruling, Morello filed a motion for new trial, and the district court denied the motion. Morello appeals the district court's judgment granting the State's motion for summary judgment and the district court's order denying his motion for new trial. We will reverse the district court's judgment and remand for further proceedings.
BACKGROUND
The property at issue in this case was originally owned by Vision Metals, Inc. ("Vision"), and was previously used as a *332 pipe-manufacturing facility. See White Lion Holdings, L.L.C. v. State, No. 01-14-00104-CV, 2015 WL 5626564, at *1 (Tex.App.-Houston [1st Dist.] Sept. 24, 2015, no pet.) (mem. op.) (setting out background facts forming dispute between State and White Lion). There were five surface-water impoundments located on the property. Id. At some point, Vision became aware "that the impoundments were sources of groundwater contamination, including elevated concentrations of" various chemicals, and the Commission issued a hazardous-waste permit to Vision "to govern the management, closure, and long-term care of the" reservoirs. Id. ; see also Tex. Health & Safety Code §§ 361.017 (providing that Commission "is responsible for the management of industrial solid waste"), .024 (empowering Commission with ability to "adopt rules ... and establish minimum standards of operation for the management and control of solid waste"), .061 (authorizing Commission to "issue permits authorizing and governing the construction, operation, and maintenance of the solid waste facilities used to store, process, or dispose of solid waste"). As part of the closure process, caps were placed on the impoundments, and chemicals were added to stabilize them.
Along with the permit, the Commission also issued a compliance plan requiring Vision to engage in various corrective actions to clean up the contamination, monitor the groundwater, file reports regarding the corrective actions taken, file reports containing the results of testing performed on the groundwater, and "provide financial assurance for operation" of the corrective programs. See 30 Tex. Admin. Code §§ 305.401 (2016) (Tex. Comm'n on Envtl. Quality, Compliance Plan) (allowing Commission to "establish a compliance plan" "[i]n order to administer the groundwater protection requirements relating to compliance monitoring and corrective action for facilities that store, process, or dispose of hazardous waste in surface impoundments"), 335.167(a), (b) (2016) (Tex. Comm'n on Envtl. Quality, Corrective Action for Solid Waste Management Units) (requiring owner seeking permit for "processing, storage, or disposal of hazardous waste" to "institute corrective action as necessary to protect human health and the environment" and stating that "[f]inancial assurance for such corrective action shall be established and maintained"). Several years later, Vision declared bankruptcy.
After Vision declared bankruptcy, Morello bid on the property at an auction and entered into an agreement to purchase the property. A little over a month later, Morello assigned his rights to purchase the property to White Lion, which is a limited liability company that Morello formed. When the closing occurred after the assignment, Vision conveyed all of its interest in the property to White Lion. Subsequent to the closing, the Commission transferred the hazardous-waste permit and the compliance plan to White Lion.
A few years after the permit and property were transferred to White Lion, the State, on behalf of the Commission, filed a suit against White Lion alleging that White Lion did not adhere to the requirements of the compliance plan, including the financial-assurance requirement. See Tex. Water Code § 7.105 (authorizing attorney general, "[o]n the request of the ... commission," to "institute a suit in the name of the State for injunctive relief ..., to recover a civil penalty, or for both"). Later, the State amended its petition and sought to hold Morello individually liable as well. In its amended petition, the State noted that White Lion "is a limited liability company organized under the laws of Texas" and that "Morello is the manager and operator of White Lion." Further, the State alleged that an "owner or operator of *333 a facility must continue corrective action measures for the duration of the compliance period" and must submit "written reports detailing the effectiveness of the corrective action program," 30 Tex. Admin. Code § 335.166(6), (7) (2016) (Tex. Comm'n on Envtl. Quality, Corrective Action Program) (listing responsibilities for "owner or operator required to establish a corrective action program," including filing reports), and that a "new owner or operator ... must provide financial assurance within six months," itation index="5" url="https://cite.case.law/citations/?q=30%20Tex.%20Admin.%20Code%20%C2%A7%20335.166">id. § 305.64(g) (2016) (Tex. Comm'n on Envtl. Quality, Transfer of Permits) (setting out requirements for transferring permit and stating that "new owner or operator must demonstrate compliance" with financial-assurance requirement "within six months of the date of the change of ownership"). In addition, the State alleged that the compliance plan required "Morello and White Lion to" "set and record the flow rate of each recovery well each week," "inspect all aboveground collection system pipes weekly," "sample each well during the first and third quarters of each year," "complete data analysis within sixty days of sampling," "repair or propose to replace broken wells within 90 days of identifying the problem," "submit reports on January 21 and July 21 of each year summarizing the status of the corrective action plan," and "provide $574,000 in financial assurance."
Moreover, the State urged that the Commission sent "Morello and White Lion a notice of violation letter for failing to provide financial assurance," conducted an investigation of the property, and discovered that "Morello and White Lion" "had not prepared or submitted any reports regarding groundwater monitoring activities"; "had not conducted semiannual groundwater sampling and analysis"; "failed to repair or propose to replace the broken recovery wells"; "were not operating the complete, required corrective action system"; "failed to record the weekly flow rate of each recovery well"; "failed to conduct inspections of the aboveground collection system pipes on a weekly basis"; and "failed to notify the [Commission] of any periods of corrective action system shutdown." The State also asserted that "Morello and While Lion are required to perform the duties set out in the compliance plan" and were required to begin performing the duties when the Commission "transferred [the] hazardous waste permit ... and compliance plan ... to White Lion" but that neither of them "ever performed" those duties and were, therefore, "in continuous daily violation of 30 Tex. Admin. Code § 335.166(6)." See itation index="7" url="https://cite.case.law/citations/?q=30%20Tex.%20Admin.%20Code%20%C2%A7%20335.166">id. § 335.166(6). Finally, the State alleged that "Morello and White Lion were required to provide financial assurance within six months" of obtaining ownership of the property but that they "never provided financial assurance" and were "in continuous violation of 30 Tex. Admin. Code § 305.64(g)." See itation index="9" url="https://cite.case.law/citations/?q=30%20Tex.%20Admin.%20Code%20%C2%A7%20305.64">id. § 305.64(g).
Subsequent to Morello being named in the suit, the State moved for and obtained summary judgment against White Lion. In addition, the State asked the district court to sever its claims against Morello, and the district court granted the request. After the district court granted the State's motions, the State filed a motion for summary judgment against Morello. In its motion, the State urged that its attached evidence demonstrated that Morello "has ensured that nothing would be done to comply with the terms, conditions, and limitations set forth in the Compliance Plan" and failed to provide the required financial assurance. After convening a hearing on the motion and reviewing the various responsive filings, the district court granted the State's motion for summary judgment. Following that ruling, Morello filed a motion for new trial. Ultimately, the district court denied *334 Morello's motion. Morello appeals the district court's judgment in favor of the State and the order denying his motion for new trial.
STANDARD OF REVIEW
We review a trial court's granting of summary judgment de novo. Valence Operating Co. v. Dorsett, 164 S.W.3d 656, 661 (Tex. 2005). When reviewing the granting of a traditional motion for summary judgment, we take as true all evidence favorable to the nonmovant and indulge all reasonable inferences and resolve any doubts in its favor. Id. Summary judgment is properly granted when the evidence establishes that the movant "is entitled to judgment as a matter of law" because there are no genuine issues of material fact. Tex.R. Civ. P. 166a(c). In addition, "[u]nder Rule 166a, a trial court cannot grant summary judgment for a reason that the movant does not present to the trial court in writing," and "in an appeal from a summary judgment, issues an appellate court may review are those the movant actually presented to the trial court." Cincinnati Life Ins. Co. v. Cates, 927 S.W.2d 623, 625 (Tex. 1996).
DISCUSSION
In three issues on appeal, Morello contends that the district court's decision to grant the State's motion for summary judgment "was error requiring reversal of such judgment and remand of the case for a new trial" because the State did not establish a basis upon which he could be held individually liable for the alleged violations; that the district court "abused its discretion and committed harmful, reversible error by denying Morello's Motion for New Trial based on the erroneous severance of the State's claims against White Lion"; and that the district court "abused its discretion and committed harmful, reversible error by denying Morello's Motion for New Trial based on newly discovered evidence." Given our resolution of Morello's first issue on appeal, we need not address his remaining two issues.
Summary Judgment
As set out above, although the State acknowledged that White Lion is a limited liability corporation and that the obligations that were imposed on Vision had been transferred to White Lion, the State still sought to impose individual liability on Morello for violations of the compliance plan and permit. When challenging the granting of the State's motion for summary judgment in his first issue, Morello highlights that the State acknowledged in its amended petition that White Lion "is a limited liability company organized under the laws of Texas" and that "Morello is the manager and operator of White Lion." In light of the fact that White Lion is a limited liability company, Morello argues that he cannot be held individually liable for the conduct at issue because the State did not attempt to pierce the veil of the company and because the State has not asserted that his alleged misconduct falls within the type of conduct for which an agent of a limited liability company may be held individually liable for his actions taken on behalf of the company.
Although the issue of individual liability in the context of corporate law has been more clearly established, the issue as it pertains to limited liability companies is less settled. For corporations, it is a "bedrock principle of corporate law ... that an individual can incorporate a business and thereby normally shield himself from personal liability." Willis v. Donnelly, 199 S.W.3d 262, 271 (Tex. 2006) ; see Castleberry v. Branscum, 721 S.W.2d 270, 271 (Tex. 1986) (providing that "[t]he corporate form normally insulates shareholders, officers, *335 and directors from liability for corporate obligations"); see also Holloway v. Skinner, 898 S.W.2d 793, 795 (Tex. 1995) (explaining that, in general, "the actions of a corporate agent on behalf of the corporation are deemed the corporation's acts"). That principle is subject to exceptions in circumstances in which maintaining the corporate shield would result in " 'injustice' and 'inequity,' " including situations involving "fraud, evasions of existing obligations, circumvention of statutes, monopolization, criminal conduct, and" other similar behavior. SSP Partners v. Gladstrong Invs. (USA) Corp., 275 S.W.3d 444, 455 (Tex. 2008). For example, the general principle does not apply if the owner is essentially the alter ego of the corporation and caused the corporation to commit fraud. Tryco Enters., Inc. v. Robinson, 390 S.W.3d 497, 507-08 (Tex.App.-Houston [1st Dist.] 2012, pet. dism'd). In those types of circumstances, "the corporate veil may be pierced" and liability imposed on a corporate officer. See ids="7095072" index="18" url="https://cite.case.law/sw3d/390/497/#p507">id. at 508. The inequitable conduct "is necessary before disregarding the existence of a corporation as a separate entity. Any other rule would seriously compromise what we have called a 'bedrock principle of corporate law'-that a legitimate purpose for forming a corporation is to limit individual liability for the corporation's obligations." SSP Partners, 275 S.W.3d at 455.
At the time that White Lion was formed, the creation of limited liability companies was governed by the Texas Limited Liability Company Act. See Act of May 25, 1991, 72d Leg., R.S., ch. 901, § 46, 1991 Tex. Gen. Laws 3161, 3192-216 (amended 2003, 2007, 2009, 2011, 2013) (current version at Tex. Bus. Orgs. Code §§ 101.001 -.622). Prior to trial in this case, the legislature promulgated the Business Organizations Code, which became effective in January 2006 before the State filed its suit and governs, among other things, the creation of limited liability companies. See Act of May 13, 2003, 78th Leg., R.S., ch. 182, § 1, 2003 Tex. Gen. Laws 267, 267-595 (adopting prior version of Business Organizations Code); see also Tex. Bus. Orgs.Code §§ 402.001, .003, .005 (setting out transitional period by which entities formed prior to passage of Code were governed by prior law, procedure by which previously existing entity may elect to be governed by Code, and deadline by which Code provisions begin to apply to previously existing entities). Both the Act and the Code mandate that "a member or manager is not liable for the debts, obligations or liabilities of a limited liability company including under a judgment, decree, or order of a court" "[e]xcept as and to the extent the" agreement of the company specifically provides "otherwise." Tex. Bus. Orgs.Code § 101.114 ; Act of May 25, 1991, 72d Leg., R.S., ch. 901, § 46, art. 4.03, 1991 Tex. Gen. Laws 3161, 3203. Further, the Act and the Code explain that a "member of a limited liability company" may only be named as a party in an action "by or against" the company if the suit is brought "to enforce a member's right against or liability to the" company. Tex. Bus. Orgs.Code § 101.113 ; Act of May 25, 1991, 72d Leg., R.S., ch. 901, § 46, art. 4.03, 1991 Tex. Gen. Laws 3161, 3203. Neither the Act nor the version of the Code in effect at the time of the lawsuit mentioned "veil-piercing principles as an exception to limited liability or whether or how such remedies might be applied against" limited liability companies. See Shook v. Walden, 368 S.W.3d 604, 613 (Tex.App.-Austin 2012, pet. denied) (discussing absence of veil-piercing provisions from Act); Act of May 13, 2003, 78th Leg., R.S., ch. 182, § 1, 2003 Tex. Gen. Laws 267, 267-595.[1]
*336 Recently, this Court was presented with a case in which we were asked to consider the potential applicability of veil piercing to limited liability companies. See Shook, 368 S.W.3d at 607. In the opinion, this Court acknowledged that no statute in effect at that time addressed veil-piercing concepts in the context of limited liability companies, and this Court assumed for the sake of addressing the appellant's arguments that those concepts could be applied and determined that if they were applied, "the availability of the veil-piercing remedy would be governed by extra-statutory equitable principles." Id. at 607, 613, 619. When describing the possible contours of those principles, this Court explained that "claimants seeking to pierce the veil of" a limited liability company "must meet the same requirements" that would be necessary to pierce the veil of a corporation under the governing law in effect during the time relevant to the appeal. Id. at 621.
Under the Business Corporation Act and under the provisions of the Code in effect prior to trial, those standards provide that a "holder of shares, an owner of any beneficial interest in shares, or a subscriber for shares whose subscription has been accepted, or any affiliate" may not be held liable "to the corporation or its obligees with respect to," among others, "any contractual obligation of the corporation or any matter relating to or arising from the obligation on the basis that the holder, [beneficial] owner, subscriber, or affiliate is or was the alter ego of the corporation," "or on the basis of actual" "or constructive fraud, a sham to perpetrate a fraud, or other similar theory," unless "the obligee demonstrates that the holder, [beneficial] owner, subscriber, or affiliate caused the corporation to be used for the purpose of perpetrating and did perpetrate an actual fraud on the obligee primarily for the direct personal benefit of the holder, [beneficial] owner, subscriber, or affiliate." See Act of May 13, 2003, 78th Leg., R.S., ch. 182, § 1, sec. 21.223, 2003 Tex. Gen. Laws 267, 427; Act of May 13, 1997, 75th Leg., R.S., ch. 375, § 7, art. 2.21, 1997 Tex. Gen. Laws 1516, 1522. Further, the Business Corporation Act and the Code provide that the liability described above "is exclusive and preempts any other liability" imposed "under common law or otherwise" but does not limit a person's obligation if the person has agreed "to be personally liable" or "is otherwise liable to the obligee" by the Business Corporation Act or Code or by another "applicable statute." See Act of May 13, 2003, 78th Leg., R.S., ch. 182, § 1, sec. 21.224, 2003 Tex. Gen. Laws 267, 427; Act of May 13, 1997, 75th Leg., R.S., ch. 375, § 7, art. 2.21, 1997 Tex. Gen. Laws 1516, 1523.
Similar to Shook, we do not need to decide whether veil-piercing concepts apply in the limited liability context because although Morello challenged the ability of the State to hold him personally liable for the alleged misconduct, the State did not assert in its petition, its motion for summary judgment, or its response to Morello's reply to the State's motion for summary judgment that it was attempting to pierce White Lion's "veil" in order to hold Morello individually liable or, relatedly, that Morello attempted to cause or did cause White Lion to perpetuate a fraud on the State primarily for his direct personal *337 benefit.[2] See Endsley Elec., Inc. v. Altech, Inc., 378 S.W.3d 15, 22 (Tex.App.-Texarkana 2012, no pet.) (explaining that "[t]he various theories for piercing the corporate veil must be specifically pled or they are waived, unless they are tried by consent"); see also Sanchez v. Mulvaney, 274 S.W.3d 708, 712 (Tex.App.-San Antonio 2008, no pet.) (affirming summary judgment in favor of owner of limited liability corporation and explaining that there was no evidence of fraud that would make owner individually liable for breach of contract). For example, the State did not allege that White Lion had "been used as a 'sham' to perpetuate 'fraud' or to 'evade an existing legal obligation,' or ... [had] been organized and operated as a mere 'tool' or 'business conduit' of another person, i.e., an 'alter ego.' " See Shook, 368 S.W.3d at 611 (quoting Castleberry, 721 S.W.2d at 271-72 ); see also Castleberry, 721 S.W.2d at 272 (explaining that "[a]lter ego applies when there is such unity between corporation and individual that the separateness of the corporation has ceased and holding only the corporation liable would result in injustice"). Accordingly, the State failed to invoke any veil-piercing theory that Texas law might conceivably recognize in the limited-liability-company context.
Instead, the State attempted to rely on the common-law principle allowing for a corporate officer to be held individually liable when he "knowingly participates in tortious or fraudulent acts ... even though he performed the act as an agent of the corporation."[3] See Nwokedi v. Unlimited Restoration Specialists, Inc., 428 S.W.3d 191, 201, 210 (Tex.App.-Houston [1st Dist.] 2014, pet. denied) (upholding individual liability for person who owned controlling interest in company where evidence showed that he participated in company's fraud by engaging in contract negotiations, informing representative which contract terms to modify, telling other company that it would be receiving checks from Travelers, and instructing Travelers to not issue check to other company); see also Leyendecker & Assocs., Inc. v. Wechter, 683 S.W.2d 369, 375 (Tex. 1984) (rejecting argument that employee cannot be held liable for tort committed in scope of employment and explaining that "[a] corporation's employee is personally liable for tortious acts which he directs or participates in during his employment"); Physio GP, Inc. v. Naifeh, 306 S.W.3d 886, 889 (Tex.App.-Houston [14th Dist.] 2010, no pet.) (providing that "[t]he purpose of individual liability in the corporate setting is to prevent an individual from using the corporate structure or agency law as a blanket to insulate himself from liability for his otherwise tortious conduct"); Sanchez, 274 S.W.3d at 712 (explaining that "the corporate veil is not required to be pierced" "to hold an agent individually liable for his tortious or fraudulent acts," distinguishing issue of individual liability from that of *338 liability under alter ego, and stating that trial court erred by rendering summary judgment in favor of employee on non-contract claims on ground that plaintiffs were required to pierce corporate veil); Dixon v. State, 808 S.W.2d 721, 723-24 (Tex.App.-Austin 1991, writ dism'd w.o.j.) (affirming individual liability where corporate officer committed tort of conversion). Specifically, the State acknowledged that the structure of a limited liability company "is intended to shield its members from the liabilities and obligations of the company,"see Tex. Bus. Orgs.Code § 101.114, but the State urged that the "statutory shield does not deflect the liability" for the conduct at issue and was "not required to be pierced."
Although the State attempted to invoke this general rule of personal liability when moving for summary judgment, the State did not allege in its live petition or in its motion for summary judgment that Morello engaged in any fraudulent or tortious activity; on the contrary, the State argued in its motion that "[t]his matter is not a tort action" and is instead "a statutory enforcement action brought against Morello as operator and sole decision maker of White Lion." Similarly, in the State's reply to Morello's response to the State's motion for summary judgment, the State clarified that its arguments regarding Morello's behavior "are viewed[ ] not in the context of a tort."
Instead of urging that Morello engaged in fraudulent or tortious conduct, the State contended that this principle of law also covers "wrongful acts."[4] Under this expanded reading of the general principle, the State asserted in its motion for summary judgment that Morello can be held individually liable for the failure to adhere to the terms of the compliance agreement that was transferred to White Lion and for the failure to provide financial assurance because that conduct violated provisions of the Administrative Code; because section 7.101 of the Water Code provides that "[a] person may not cause, suffer, allow, or permit a violation of a statute within the commission's jurisdiction or a rule adopted or an order or permit issued under such a statute"; and because section 7.102 of the Water Code authorizes the assessment of a penalty on "[a] person who causes, suffers, allows, or permits a violation of a statute, *339 rule, order, or permit." See Tex. Water Code §§ 7.101, .102; see also Tex. Gov't Code § 311.005(2) (defining "[p]erson").[5] In other words, the State asserted in its motion that "when a statute provides for individual liability, as does the Water Code, an individual corporate officer may be held liable for his own violations."
In light of the argument above, the State, in its motion for summary judgment, pointed to various portions of Morello's deposition and other evidence establishing, among other things, Morello's role in the company, in performing the corrective actions required, in failing to repair equipment that had been installed to treat the contaminated groundwater, in failing to treat or test the groundwater, and in removing from the property or throwing away equipment that had been installed as part of the compliance plan and asserted that at "all times relevant to this suit, Morello has been personally, substantially, and solely involved with operating, managing, and making decisions concerning the facility and its operation" because he "is the sole manager and officer of White Lion." Accordingly, the State asserted that Morello could be held individually liable for the "wrongful acts which he directs, participates in, or has knowledge of and assented to" and that "Morello's actions amount to deliberate, blatant, and conscious violation of the Compliance Plan and each of its terms, conditions, and limitations." Relatedly, the State contended that Morello "as the sole member, owner, and decision-maker of White Lion, is a person that caused, allowed, and/or permitted White Lion to violate the Compliance Plan and related rules."
Turning to the issue of whether the State established as a matter of law that Morello could be held individually liable, we note, as a preliminary matter, that all of the cases that the State cited in its summary-judgment motion for the proposition that "wrongful acts" fall within the principle allowing for individual liability of corporate agents recite the longstanding rule that a corporate employee may be held liable for his "tortious" or his "fraudulent" acts when acting as an agent but do not indicate that conduct falling outside of those types of misconduct may also serve as a basis for individual liability. See Leyendecker, 683 S.W.2d at 374-75 (affirming judgment against company employee for libel); Nwokedi, 428 S.W.3d at 210 (addressing individual liability for committing fraudulent transfers under Uniform Fraudulent Transfers Act); Sanchez, 274 S.W.3d at 712-13 (remanding case to trial court to allow court to address issue of individual liability for employee on claims that employee committed tortious or fraudulent acts); Dixon, 808 S.W.2d at 723, 724 (discussing individual liability of company president for "actively participating in the tort of conversion").
Furthermore, the cases relied on by the State as support for the proposition that the legislature intended to allow for individual liability to be imposed on an agent of a limited liability company even in the *340 absence of fraudulent or tortious conduct through the passage of sections 7.101 and 7.102 of the Water Code do not seem to support that proposition and certainly do not compel that type of groundbreaking conclusion. First, the State referred to Miller v. Keyser, 90 S.W.3d 712 (Tex. 2002), for the proposition that an individual is liable for his own violations even if he was acting on behalf of a corporation when there is a governing statute that allows for the imposition of individual liability. In that case, the supreme court determined that an agent of a corporation may be held liable under the Deceptive Trade Practices Act, which the court explained allows "a consumer to bring suit against any person whose false, misleading, or deceptive acts, or other practices ... are the producing cause of the consumer's harm" and to bring suit "for 'any unconscionable action or course of action by any person. ' " Id. at 715 (citing Tex. Bus. & Com.Code § 17.50(a)(1) and quoting Tex. Bus. & Com.Code § 17.50(a)(3) ).[6] Although the court did discuss the broad scope of the phrase "any person" in the Deceptive Trade Practices Act when determining that Keyser's role as agent did "not excuse Keyser from DTPA liability," see id. at 716, 717, the court primarily focused on how the Deceptive Trade Practices Act is designed to protect consumers and is construed in favor of consumers, id. at 715, and how its conclusion that Keyser could be held personally liable "comport[ed] with Texas' longstanding rule that a corporate agent is personally liable for his own fraudulent or tortious acts," id. at 717. In other words, the court explained that "[a]gents are personally liable for their own torts" and that "[t]here is no basis for concluding differently based on the claims brought under the" Deceptive Trade Practices Act. Id. at 718. In the current case, there has been no showing that the alleged failures to satisfy the terms of the compliance plan and failure to provide financial assurance are tortious or fraudulent conduct of Morello individually or that those failures to comply should somehow be treated as if they were. On the contrary, as discussed above, the State did not allege any fraudulent conduct and specifically stated that the violations at issue are not torts.
Next, the State pointed to State v. Malone Service Co., 853 S.W.2d 82, 84-85 (Tex.App.-Houston [14th Dist.] 1993, writ denied). In Malone, our sister court overruled the argument that the president of a company and its plant manager could not be held individually liable under a former provision of the Water Code, which provided that " '[a] person who violates any provision of a permit issued under this chapter shall be subject to a civil penalty in any sum not exceeding $5,000 for each day of noncompliance and for each act of noncompliance.' " Id. at 84 (quoting former subsection 27.101(a) of Water Code). When determining that individual liability was appropriate, the court noted that "a corporate officer who participates in or directs the commission of a tort may be held personally liable" and then likened the conduct at issue in the case to "an environmental tort." Id. at 85.
As support for the proposition that a corporate officer can be held liable for the commission of an environmental tort, the *341 Malone court cited Leyendecker & Assoc., Inc. v. Wechter, 683 S.W.2d 369, 375 (Tex. 1984). However, the opinion in Leyendecker did not discuss environmental torts or suggest that a corporate officer could be held liable for one and instead addressed whether a corporate employee could be held individually liable when he committed the tort of libel in the scope of his employment. See id. Moreover, the conduct at issue in Malone that the court analogized to an environmental tort was consistent with what the legislature had described as an environmental tort in a former provision of the Civil Practice and Remedies Code discussing proportionate responsibility. See Tex. Civ. Prac. & Rem.Code § 82.005(d)(1) (providing that provision governing products-liability suits does not apply to "environmental tort as defined by Sections 33.013(c)(2)"). At the time that Malone was decided, the provision explained that an environmental tort occurred when "personal injury, property damage, or death" are "caused by depositing, discharge, or release into the environment of any hazardous or harmful substances." See Act of June 3, 1987, 70th Leg., 1st C.S., ch. 2, § 2.09, sec. 33.013(c)(2), 1987 Tex. Gen. Laws 37, 42, repealed by Act of June 2, 2003, 78th Leg., R.S., ch. 204, §§ 4.07, .10(5), sec. 33.013, 2003 Tex. Gen. Laws 847, 858, 859. In Malone, the defendant company was ordered by the Texas Water Quality Board to stop placing waste materials into an "earthen pit and to close the pit," but the company "covertly" "continued to pump sludge into the pit," shut down the pumps when inspectors came, and disregarded the terms of a compliance agreement by tearing holes in the tarpoleum fabric used to cover and close the pit in order to "continue to pump waste into the pit." 853 S.W.2d at 84. In the current case, the conduct alleged by the State does not align as easily with the description of an environmental tort because there was no allegation that Morello deposited or discharged any hazardous substances. Regardless, the analysis from Malone is not binding on this Court. See HWY 3 MHP, LLC v. Electric Reliability Council of Tex. (ERCOT), 462 S.W.3d 204, 211 n.4 (Tex.App.-Austin 2015, no pet.) (explaining that analysis from sister court of appeals is not binding); see also State v. Johnson, No. 03-98-00086-CV, 1998 WL 818051, at *7 (Tex.App.-Austin Nov. 30, 1998, no pet.) (not designated for publication) (distinguishing Malone from facts of that case and explaining that Malone and similar cases "have held a corporate officer responsible for torts of the corporation" (emphasis added)).[7]
For all of these reasons, we must conclude that the State failed to establish as a *342 matter of law that Morello could be held individually liable for the alleged violations at issue and, therefore, that the district court erred by granting the State's motion for summary judgment. Accordingly, we sustain Morello's first issue on appeal.
CONCLUSION
Having sustained Morello's first issue on appeal, we need not reach his remaining two issues challenging the denial of his motion for new trial, and we reverse the district court's grant of summary judgment and remand this cause for further proceedings consistent with this opinion.

In 2011, the legislature added section 101.002 of the Business Organizations Code, which specified that the statutes "regulating and restricting veil piercing of corporations" applied to limited liability companies, "their members, and their managers." Shook v. Walden, 368 S.W.3d 604, 613-14 (Tex.App.-Austin 2012, pet. denied) ; see Tex. Bus. Orgs.Code § 101.002 (explaining that sections 21.223, 21.224, 21.225, and 21.226 of Code apply in limited-liability-company context).

During the hearing regarding the motion for summary judgment, the State said the following: "To be clear, the [S]tate's not seeking to pierce the corporate veil."

We note that this Court was recently asked to review the propriety of imposing individual liability on agents of a limited liability company under this common-law principle. See Key v. Richards, No. 03-14-00116-CV, 2016 WL 240773, at *2-4 (Tex.App.-Austin Jan. 13, 2016, no pet. h.) (mem. op.). In that case, this Court noted that the legislature has "broadly insulated ... members from liability for" a limited liability company's obligations but upheld the imposition of individual liability for agents "without clear direction from the Supreme Court holding that the legislation has thereby abrogated longstanding common law recognizing that corporate agents are liable for their own tortious conduct and may even be liable for an entity's liabilities based on the equitable principles of veil piercing." Id. at *3 n.4.

In its appellee's brief, the State points to a prior unpublished opinion by this Court as support for its assertion that an employee or owner of a limited liability company can be held individually liable for an entity's wrongdoing if he "participates in the entity's wrongful conduct." See Coleman v. Savoie, No. 03-97-00548-CV, 1998 WL 305322, at *3-4 (Tex.App.-Austin June 11, 1998, no pet.) (not designated for publication). However, because that opinion was issued in 1998 and was not designated for publication, it does not have any precedential value. See Tex.R.App. P. 47.7(b). Although we need not further address the analysis from that case, we note that although this Court upheld the judgment imposing individual liability on the "employee-manager" of a limited partnership and a limited liability company for personally installing a sidewalk over the appellee's easement and, thereby, interfering with the appellee's use of the easement, Coleman, 1998 WL 305322, at *1, *3 n.1, *3-4, the cases that were cited in support for the proposition that the employee could be held "personally liable for the entity's wrongdoing" because he actively participated in the wrongdoing all recited the general rule of law that an employee may be held personally liable for his tortious or fraudulent acts that he committed during his employment, see itation index="68" url="https://cite.case.law/citations/?q=1998%20WL%20305322">id. at *3 (citing Leyendecker Assocs., Inc. v. Wechter, 683 S.W.2d 369, 375 (Tex. 1984) ; Taiwan Shrimp Farm Vill. Ass'n, Inc. v. U.S.A. Shrimp Farm Dev., Inc., 915 S.W.2d 61, 73 (Tex.App.-Corpus Christi 1996, writ denied) ; McIntosh v. Copeland, 894 S.W.2d 60, 63 (Tex.App.-Austin 1995, writ denied) ; Remenchik v. Whittington, 757 S.W.2d 836, 839 (Tex.App.-Houston [14th Dist.] 1988, no writ) ; Great Am. Homebuilders, Inc. v. Gerhart, 708 S.W.2d 8, 10-11 (Tex.App.-Houston [1st Dist.] 1986, writ ref'd n.r.e.) ).

When reviewing the summary judgment granted in favor of the State against White Lion, our sister court of appeals discussed section 7.102 and explained that "[s]tatutes providing for liability of any 'person' in violation allow courts to render judgments against both corporate entities and their agents." See White Lion Holdings, L.L.C. v. State, No. 01-14-00104-CV, 2015 WL 5626564, at *3 (Tex.App.-Houston [1st Dist.] Sept. 24, 2015, no pet. h.) (mem. op.). However, that statement was made in the context of determining whether our sister court had jurisdiction over the claims in that case and whether the district court properly severed the claims against White Lion, id. at *2-4, and our sister court was not called upon to and did not address whether individual liability was appropriate in the absence of any proven tortious or fraudulent conduct.

The actual language of the Deceptive Trade Practice Act in effect at the time the supreme court issued its opinion in Keyser provided as follows: "A consumer may maintain an action where any of the following constitute a cause of economic damages or damages for mental anguish: ... the use or employment by any person of a false, misleading, or deceptive act or practice" or "any unconscionable action or course of action by any person." See Act of May 17, 1995, 74th Leg., R.S., ch. 414, § 5, sec. 17.50(a), 1995 Tex. Gen. Laws 2988, 2992 (amended 2005) (current version at Tex. Bus. & Com.Code § 17.50(a) ).

In its motion for summary judgment, the State also relied on a memorandum opinion from this Court. See Health Enrichment & Longevity Inst., Inc. v. State, No. 03-03-00578-CV, 2004 WL 1572935 (Tex.App.-Austin July 15, 2004, no pet.) (mem. op.). In that case, this Court affirmed the imposition of civil penalties against the owner of an assisted living facility. Id. at *1, *8-9. However, in that case, liability on the sole owner was imposed for running an assisted living facility without a license. Id. at *8. Both the current version and the former version of the Health and Safety Code in effect at the time Health Enrichment was decided mandate that a "person may not establish or operate an assisted living facility without a license" and authorize the imposition of a civil penalty on a person who operates a facility without a license. Tex. Health & Safety Code §§ 247.021, .045(b)-(c); Act of May 7, 1999, 76th Leg., R.S., ch. 233, § 1, secs. 247.021, .045, 1999 Tex. Gen. Laws 1064, 1066, 1072. The provisions authorizing civil penalties for someone who operates a facility without a license in the current and the former versions are separate from the portions authorizing the imposition of penalties for failing to comply with a rule and impose a harsher minimum penalty, which is some indication that the legislature intended to treat violations for operating a facility without a license differently from the failure to comply with an administrative rule. See Tex. Health & Safety Code § 247.045(a) ; Act of May 7, 1999, 76th Leg., R.S., ch. 233, § 1, sec. 247.045, 1999 Tex. Gen. Laws 1064, 1071-72.
In this case, there has been no allegation that Morello was similarly operating a facility without a license, and there is no statute similarly singling out for the imposition of a civil penalty the conduct alleged in this case that is distinct from the provision authorizing the imposition of a civil penalty for failing to comply with a governing rule. Accordingly, we do not believe that the analysis from Health Enrichment supports the State's assertion that Morello was individually liable for the alleged misconduct in this case as a matter of law. Cf. Tex. Health & Safety Code § 247.045(h) (containing provision authorizing State to "seek satisfaction from any owner, other controlling person, or affiliate of the person found liable," which was enacted after Health Enrichment ).